## BAKER & STRAWN v. BUTLER BROS. & LIVELY.

No. 18517. Opinion Filed July 2, 1929.

Rehearing Denied Jan. 7, 1930.

J. A. Bass and Geo. N. Otey, for plaintiffs in error.

Brown, Brown & Williams, for defendants in error.

CULLISON, J. This case comes to this court on appeal from the district court of Carter county, Okla., wherein defendants in error, plaintiffs below, Butler Bros. & Lively, sued plaintiffs in error, defendants below, Baker & Strawn, to recover the sum of $13,-442.75, claimed to be due and owing by defendants to plaintiffs for the drilling of an oil well on defendants' property in Carter county, Okla., in what is known as the Hewitt oil field, and on what is known as the Baker & Strawn-Dillard farm, and asking that they, plaintiffs, be declared to have a valid and subsisting lien upon defendants' property, hereinafter referred to, and that said lien be foreclosed and the property be ordered sold and the proceeds distributed according to law and to satisfy the claim of plaintiffs.

The parties to this appeal will be hereinafter referred to as they appeared in the court below.

The provisions of the contract for the drilling of said well, upon which this suit is predicated, and which are pertinent to the issues raised on the trial of the case in the lower court and on this appeal, will be set out in the statement of facts which follows:

The plaintiffs in their petition state two causes of action, to wit:

First, that plaintiffs, through their agent, P. H. Lively, hereinafter called Lively, entered into a contract with defendants, through their agent, W. L. Larkin, hereafter called Larkin, to drill an oil and gas well, known as the 6-B well, of defendants on the C. Dillard farm in Carter county, Okla. Defendants owned a gas lease on said farm, the same being:

"The east half of the northwest quarter of the northwest quarter and the west half of the northeast quarter of the northwest quarter, sec. 22, twp. 4 south, range 2 east, Carter county, Okla."

A copy of the contract sued on is attached to the plaintiffs' petition, and among other things provides:

"The said well, unless sooner abandoned by direction of the party of the second part, is to be drilled to the lime which is from 2,694 to 2,785 feet, unless oil should be found in paying quantities between 2,350 and the above named lime. The consideration for which shall be $4.25 per foot. Should second party order any core drilling, the consideration for which shall be $6.25 per hour."

Plaintiffs allege that, in pursuance of said contract, plaintiffs moved upon said premises, commenced the drilling of an oil and gas well thereon, and drilled the same to the lime, which instead of being encountered below 2,694 feet, was, as a matter of fact, encountered at the depth of 2,563 feet, for which work, under the terms of said contract, plaintiffs were to receive $4.25 per foot, and that for the drilling of said well from the surface to the depth of the lime encountered at a depth of 2,563 feet they became entitled to the sum of $10,892.75.

Plaintiffs further allege that demand was made upon defendants for payment of the above sum and payment thereof refused, and that by reason of such indebtedness due plaintiffs and a statement of lien properly filed with the court clerk of said county, plaintiffs became entitled to judgment against defendants in the sum of $10,892.75, and for a lien upon the oil and gas lease on the land above described.

For their second cause of action, plaintiffs allege that at the instance of defendants they did special drilling, after the completion of the contract as set out in the first cause of action, upon the 6-B well of defendants on the above-described land; that they operated a rotary rig for 120 hours, and that the reasonable and customary price for such work in the Hewitt field, the field in which the drilling was done, was $6.25 per hour, or $750; that plaintiffs furnished tools and labor for a period of 72 hours in running a packer in said well, circulating the mud and water therein, and that the reasonable and customary price for such work is $6.25 per hour, or $450; that from November 29, 1925, to December 16, 1925, plaintiffs were awaiting orders from defendants 18 days, and that the reasonable rental value of their tools during such time was $75 per day, or $1,350.

Plaintiffs then pray for judgment on their first and second causes of action in the sum of $13,442.75 and attorney's fees and costs of the suit.

The defendants filed their answer, admitting the execution of the contract, the filing of plaintiffs' mechanic's liens with the court clerk, but deny that the contract has been completed by plaintiffs or that they had complied with it in full as alleged; allege that when plaintiffs reached a depth of 886 feet and had begun to run the 12½-inch casing in said well, plaintiffs negligently dropped said casing, causing it to collapse and making it necessary to use a smaller size casing, and that plaintiffs agreed to pay $1,200 on the smaller casing, which amount was to be deducted from the contract price.

The plaintiffs admit that there was an agreement to credit defendants with the $1,200 above referred to, and the jury found that such agreement was in fact made.

The contract in question contains the following provision:

"When the said well approaches the oil or gas bearing sand, the party of the first part shall notify the party of the second part, or its agents in charge of the farm or lease, and thereupon any further drilling and casing into or through the sand to be as requested by the party of the second part (defendants) or its agents in charge of the farm or lease, but the work in connection therewith shall be done by and under the direction and at the risk of the party of the first part."

Defendants in their answer further allege that plaintiffs encountered oil sand at 2,607 feet and continued in said sand to 2,611 feet and failed to give defendants notice as required by the above clause of the contract, and drilled through said sand, and that in order to save the sand for a test a packer, attached to the 8¼-inch casing, was run into the well, and through the negligence of plaintiffs the casing became frozen; that plaintiffs refused to release the frozen casing and abandoned the well; that thereafter defendants took charge of the drilling, expended $5,362.53 in loosing said casing. Defendants then ask judgment against plaintiffs for $6,562.53, including the $1,200 for the casing ruined at 886 feet, above referred to, and $1,000 attorney's fees.

In answer to plaintiffs' second cause of action defendants deny that plaintiffs did any special work, and allege that if there was any delay it was occasioned by plaintiffs' negligence for drilling through the oil sand. And by cross-petition, defendants ask judgment against plaintiffs in the sum of $6,426.53 and $1,000 attorney's fees.

Plaintiffs in their reply to defendants' answer and cross-petition plead a general denial of the averments therein contained. Thereafter plaintiffs filed their supplemental

petition, alleging that the clause of the contract pertaining to the depth to which they should drill, above set out, is ambiguous; that it was the intention of the parties to the contract at the time they entered into the same that said well was to be drilled by the plaintiffs with a rotary rig, not to a depth of 2,694 or 2,785 feet, but to the depth of the lime, which was known by all the parties to said contract to be found in the vicinity of 2,694; that the plaintiffs completed said contract when they reached the depth of the lime as alleged in their first cause of action in the petition set forth above.

The jury in the trial court rendered a verdict in favor of plaintiffs in the sum of $10,442.75; allowing plaintiffs $10,892.75 for drilling the well 2,563 feet at $4.25 per foot, and $750 for drilling five days thereafter at $150 per day. Defendants were allowed their claim of $1,200 for casing ruined at 886 feet, as set out above. The claim of plaintiffs for running a packer in the well and circulating mud and water therein, in the sum of $450, was denied.

From the verdict and judgment rendered thereon, defendants appeal to this court. In the petition in error defendants set out 42 assignments of error. In their brief they elect to discuss these assignments under ten propositions of law, but from an examination of the record we find there are only two questions in the case for adjudication, viz.:

(a)  Interpretation of the contract.

(b)  Was the work done as provided by contract?

The contract in this case, reduced to its simplest form and meaning, provides: That the plaintiffs shall drill an oil and gas well, on the land in dispute, down to the lime; that the defendants are to pay plaintiffs $4.25 per foot for drilling said well.

We quote from the testimony of both parties to this suit; which testimony shows that the lime which the parties made reference to in the contract was the lime strata, which, from findings made on previous drillings, would probably be found between 2,694 and 2,785 feet, and which establishes that the object in the minds of both parties was to drill to this lime strata.

Mr. Lively, one of the plaintiffs, testified:

"Q. Before you reached the sand, did you reach any formation mentioned in the contract? A. At 2,560 or 2,561 we encountered the lime. Q. Is that known—When you were entering into this contract, what was said about the depth of the well, as to whether it was to be drilled to a specified depth or to the lime? (Objection interposed by defendant.) By the Court: What's the purpose? Mr. Williams, counsel for plaintiffs: To show the true intention of the parties at the time they entered into this contract. By the Court: Proceed. (Exceptions allowed.) A. Well, he told me he wanted to drill it to the lime, if he did not reach the lime, to 2,800 feet. Q. Who furnished the information as to the depth the lime would be encountered? Did you do that or did the defendants? A. Mr. Larkin. Q. You did not have anything to say about that? A. I did not know there was any lime there." (C.-M. 56, 57, 58.)

Mr. Strawn, one of the defendants, testified as follows:

"Q. Mr. Strawn, when you first entered into this contract, your intention was for Butler Bros. & Lively to go to the top of the lime and Baker & Strawn would take up the well at that point and carry it on down and make a deep test? A. Yes, sir. Q. That was your intention? A. Yes, sir. Q. It was not the intention of Butler Bros. & Lively to drill the well any deeper than the lime? A. We were to be satisfied we were in the lime." (C.-M. 237.)

Defendants in their answer contend and deny "that the contract has been completed by plaintiffs or that they have complied with it in full as alleged."

Defendants in support of this contention say, on page 82 of their brief:

"The evidence herein quoted and the contract both show that the intention of the parties was clearly shown; that a well should be drilled 'to the lime which is between 2,694 to 2,785 feet.' This language can hold nothing of mystery or ambiguity; it simply means what it says, that a well is to be drilled to a depth of 2,785 feet unless a lime is found in the well below 2,694 feet and 2,785, when drilling must cease."

It is clear to this court that defendants knew and understood that the well was to be drilled to the depth of 2,785 feet unless the lime, which the parties had in mind at the time the contract was entered into, was found at a lesser depth.

But the defendants do not admit this proposition. They would have us believe, and they contend, "that a well is to be drilled to a depth of 2,785 feet unless a lime is found in the well between 2,694 and 2,785 feet, when drilling must cease."

And as a further argument in support of their contention they say in the same paragraph, on page 82 of their brief:

"The well was not drilled even to 2,694 feet."

Defendants further contend:

"Undoubtedly there was error on the part of the court prejudicial to the rights of. defendants in this case in allowing evidence to go to the jury as to what happened in the well after the plaintiffs had abandoned their contract. * * *"

That is, defendants mean to say to this court that the plaintiffs had abandoned the contract at the time they reached the lime, to wit, 2,563 feet.

Neither the trial court nor this court agrees with the contention of defendants that plaintiffs abandoned the contract when they struck the lime. If plaintiffs did strike the lime, referred to in the contract, at 2,563 feet, their contract was complete and the trial court did not err in instructing the jury to that effect and in permitting evidence to be offered to prove that they did strike the lime at 2,563 feet.

It appears to us that defendants are unduly exercised over the phrase or that part of the contract which reads: "* * * is to be drilled to the lime which is from 2,694 to 2,785 feet." This phrase carries with it no legal signification. That provision of the contract shows merely an estimate on the part of defendants that lime, which was known to exist in this particular section, would probably be found between 2,694 and 2,785 feet; such estimate being based upon previous findings of lime in the various wells in the immediate vicinity. The provision does not mean that the well should be drilled to the depths specified in the contract if the lime, which was the object sought, was found at a lesser depth.

It is well settled law that "it is not the province of the court to alter a contract by construction or to make a new contract for the parties." 13 C. J. 525.

However, it is equally well established that the law furnishes certain rules for the construction of written contracts for the purpose of ascertaining from the language the manner and extent to which the parties intended to be bound. 13 C. J. 520.

The primary and most important general rule to be followed in the construction of written contracts is stated in vol. 13 C. J. at page 521:

"The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles. Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent." (Innumerable decisions cited in support thereof.)

The record convinces us that the minds of the contracting parties met, and that they agreed and they understood that plaintiffs were to drill an oil and gas well to the lime which had previously been found in that immediate vicinity at depths ranging from 2,694 to 2,785 feet, and we, therefore, hold that under the terms of the contract the plaintiffs completed the drilling when they encountered the lime at 2,563 feet.

Having determined the real issues of the contract to be "the drilling of an oil and gas well on the land described to the lime (strata or formation)," we will now consider the second or last proposition, namely:

(b) Was the work done as provided by contract?

P. H. Lively, one of the plaintiffs, who had general supervision of the drilling of the well in question for plaintiffs, in his testimony, said:

"I am an oil well driller; oil well drilling contractor; lived in Ardmore and oil field here since 1914; at 2,560 or 2,561 feet we encountered the lime; we drilled 10 or 15 feet into the lime; we told Mr. Larkin or Mr. Hubbard we believed we had the lime; Mr. Larkin did not seem to think it was the lime. We use rock bits and cones for the lime. Drilled 59 feet into the lime; used four sets of rock bits or cones drilling 59 feet. Larkin told Lively he expected lime around 2,690 feet. We stopped drilling at 2,627 feet. The last work was done when we reached the top of the lime, or 2,563 feet. The well was bailed free and clear when we stopped. At the time I quit I talked with Mr. Larkin; told Larkin, Baker & Strawn, I had completed the well."

Mr. M. L. Butler, one of the plaintiffs, testified that the depth at which the lime was encountered in the well was 2,563 feet and that they drilled into it 10 or 15 feet.

Mr. H. B. Hubbard, called as a witness for defendants, testified:

"I am foreman for Baker & Strawn on their lease out there; been in the Hewitt field since 1920; encountered the lime on the east line in one well, the 6-B, the well Mr. Larkin and Mr. Butler have been talking about. Contractor's chart showed they got lime at 2,563 feet; they never did go out of the lime; they stopped in the lime."

In answer to a question by a juror, "At 2,627 feet, at that depth, did you state all parties agreed at that depth that the hole was accepted?"—Mr. Hubbard answered,

"Agreed to stop at that depth about when we put on the last set of cones."

Mr. Geo. W. Strawn, one of the defendants, testified:

"I heard Mr. Hubbard testify regarding the time we struck the lime; his statement is substantially correct; it was reported we were into the lime in the 6-B at a depth of 2,563 feet, or thereabouts; Butler Bros. & Lively drilled in the lime in 6-B well over 50 feet. Mr. Larkin reported to me they were in the lime and wanted to stop drilling: I remember the occasion of having struck a sand in the 6-B well, in the lime."

Mr. W. L. Larkin, testifying in behalf of defendants, said:

"When I came down here from Tulsa they had reached lime in the 6-B well at 2,565 and were in the lime around 10 feet. I had a conversation with Mr. Butler right at the last concerning the lime; Mr. Butler wanted to know about getting away from any further drilling and I asked him immediately how many feet they had made with the last set of cones and he said, 'I am not sure, but I think about 20 feet,' and I said, 'All right, you put on another set of cones, they will probably make around the same depth the first ones did, and if they are still in the lime we will call it good.' By 'call it good,' I mean quit drilling."

In this conection the trial court instructed the jury as follows:

"You are instructed that if you find and believe from the evidence in this case, as applied to the instructions of the court herein, that under the terms of the contract plaintiffs were by said contract to drill to the lime, which, according to the evidence, was encountered at a depth of 2,563 feet, and that thereafter the plaintiffs delivered said well in thorough good order, free and clear of all obstructions, and that they bailed all rotary mud out of the well, both inside and outside of the 8¼-inch casing, and ran three joints of 6⅝-inch casing screwed together on a wire line to the bottom of the hole, and said three joints went to the bottom and came out free and clear, that then, and in that event, the plaintiffs are entitled to recover on their first cause of action herein, and that any further work, either drilling, running the packer or circulating, was done under a new contract and that the plaintiffs would be entitled to compensation therefor in the absence of an express agreement to the contrary, for the usual and customary prices prevailing in the community in which the well was drilled at the time the work was done by them, together with interest from December 18, 1925, at the rate of 6 per cent. per annum."

We find no error of law in the above instruction.

The evidence in this case supports the finding of the jury that plaintiffs completed their contract when they drilled to the lime at 2,563 feet.

The instruction of the court that any further work done by plaintiffs was done under a new contract and that the plaintiffs would be entitled to compensation therefor, in the absence of an express agreement to the contrary, for the usual and customary prices prevailing in the community in which the well was drilled at the time the work was done, finds ample support in the authorities.

"An implied contract arises where the intention of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts, or, as it has been otherwise stated, where there are circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intent to contract." 13 C. J. 241, and authorities cited in support thereof.

And, where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent and avails himself of the service, a promise to pay the reasonable value of the service is implied. Cincinnati R. Co. v. Bensley, 51 Fed. 738, 2 C. C. A. 480, 19 L. R. A. 796; Reeves Estate v. Moore, 4 Ind. App. 492, 31 N. E. 44.

The jury found that plaintiffs completed their driling contract as alleged by them in the first cause of action.

The jury also found that the plaintiffs at the instance of defendants did special drilling, after the completion of the contract as set out in the first cause of action, upon the 6-B well of defendants on the above described land; that they operated a rotary rig for 120 hours and that the reasonable and customary price for such work in the Hewitt field, the field in which the drilling was done, was $6.25 per hour, or a total of $750. A thorough examination of the record and testimony convinces us that the jury was warranted in finding that such additional work was done, and this court is therefore bound by such finding.

The evidence also discloses that the jury was warranted in finding that plaintiffs did not perform, and therefore were not entitled to recover for, the other items of additional work alleged in their second cause of action, and such finding is also binding on this court.

"Where the evidence reasonably tends to sustain the verdict, and when the jury has been properly instructed as to the law, and

a motion for a new trial has been denied, and the verdict of the jury approved by the trial court, the Supreme Court will not invade the province of the jury to weigh the evidence and disturb the verdict." Marker v. Gillam, 54 Okla. 766, 154 Pac. 351.

The judgment of the trial court is affirmed.

LESTER, V. C. J., and CLARK, RILEY, SWINDALL, and ANDREWS, JJ., concur.

MASON, C. J., and HUNT and HEFNER, JJ., absent.

Note.—See under (1) 6 R. C. L. p. 835; 2 R. C. L. Supp. p. 218; 4 R. C. L. Supp. p. 443; 5 R. C. L. Supp. p. 371; 6 R. C. L. Supp. p. 412; 7 R. C. L. Supp. p. 201. (3) anno. 24 A. L. R. 973; 6 R. C. L. p. 587; 2 R. C. L. Supp. p. 158; 4 R. C. L. Supp. p. 426; 5 R. C. L. Supp. p. 356; 6 R. C. L. Supp. p. 398. See "Contracts," 13 C. J. § 482, p. 523, n. 20. "Mines and Minerals," 40 C. J. § 759, p. 1128, n. 93. "Work and Labor," 40 Cyc. p. 2809, n. 13.