RABON et al. v. BERRY et al.

No. 34705. May 6, 1952.

*245 P. 2d 440.*

G. C. Spillers and G. C. Spillers, Jr., Tulsa, for plaintiffs in error.

Robert L. Hert, Stillwater, and Martin, Logan, Finney, Stanton & Moyers, Tulsa, for defendants in error.

BINGAMAN, J. This action was brought by the plaintiffs, Thomas E.

Berry and others, against Midland Co-Operative Wholesale, a corporation, to recover the sum of $15,000, less gross production taxes, held by the Midland, being the purchase price of certain oil produced from an oil and gas lease in Payne county, and taken from the lease by Midland Co-Operative, which was purchasing and taking the oil produced from said lease. At the request of Midland Co-Operative Wholesale E. R. Rabon and Mary Orene Rabon were made parties to the action, and by answer and cross-petition asserted title to the sum held by Midland. From the pleadings it appears that there was a dispute between the plaintiffs and the defendants, E. R. Rabon and Mary Orene Rabon, as to who was entitled to the fund and the same was impounded by Midland pending the determination of the ownership of said fund. The trial court rendered judgment for plaintiffs, and the defendants E. R. Rabon and Mary Orene Rabon appeal.

The essential facts are undisputed. In 1941, Thomas E. Berry, being the owner of oil and gas leases in the west half of section 13, township 18 north, range 3 east, in Payne county, entered into a contract and assignment of his oil and gas lease covering the east half of the northwest quarter of section 13, whereby he assigned, subject to certain conditions, the said oil and gas lease to E. R. Rabon. By the terms of the assignment and contract Rabon agreed to commence the drilling of a well for oil and gas upon the leasehold assigned to him on or before November 15, 1941, and to drill such well to the Wilcox sand, or a depth of 4,150 feet, unless oil or gas in paying quantities was discovered at a lesser depth. The assignment then provided that Berry excepted and reserved $10,000 worth of oil, gas and casinghead gas or any other petroleum products produced from the first well drilled upon the leasehold estate by Rabon, the sum to be paid out of one-fourth of the seven-eighths working interest, after Rabon had received $30,000 from the total production of said well. The assignment also re-

served and excepted to Berry $10,000 worth of oil, gas or casinghead gas produced and sold from each producing well subsequently drilled upon the leasehold estate, after Rabon had received the actual cost of the drilling and completing of such subsequent well, or $30,000, whichever amount should be the lesser amount, such $10,000 in each case to be an overriding royalty produced and delivered to Berry without cost or expense. The assignment further provided that Rabon should receive from the production of the lease $30,000 or the actual cost of the drilling for each dry or nonproductive well he drilled, and that during the time he was receiving payment for such dry or nonproductive well, payments to Berry should be suspended. The assignment then provided as follows:

"It is understood and agreed that the over-riding royalty payments to Berry herein reserved are based upon Ten (10) acre drilling units at One Thousand ($1,000.00), Dollars per acre (with a Ten (10) acre drilling unit meaning a condition where the well, when located in the center, will be approximately Three Hundred Thirty (330) feet from each boundary line when in a corner unit, and when located other than in a corner unit, approximately Three Hundred Thirty (330) feet from the boundary line and Six Hundred Sixty (660) feet from the nearest well location); and it is expressly agreed that should a larger drilling unit be used, that is a larger acreage, either by order of the Corporation Commission of Oklahoma or by election of Rabon, then, in that event, the over-riding royalty payment for each well shall be scaled upward at the rate of One Thousand ($1,000.00) Dollars per acre for the number of acres such larger drilling unit contains over and above Ten (10) acres, provided further that the royalty payments to Berry shall not exceed One Thousand ($1,000) Dollars per acre of the drilling unit used, regardless of the number of wells drilled on any such unit."

The first well drilled by Rabon was drilled upon the southwest 10 acres of the 80-acre lease and produced oil from

the Wilcox sand. Thereafter oil was produced by adjoining leases owned by Sunray Oil Company and Berry from a shallower sand, known as the Osage-Layton, which was found at a depth of approximately 2,400 feet. The production from the Wilcox well being small Rabon began the development of the Osage-Layton sand. His No. 2 well, on the lease, was drilled in the northeast 10 acres of the south 40 acres of the lease, and his No. 3 well was drilled in the southwest 10 acres of the south 40 acres, near the original No. 1 well, which was drilled to the Wilcox sand. Both of these wells produced oil from the Osage-Layton sand. Thereafter, Rabon drilled well No. 4, in the southwest 10 acres of the north 40 acres of the lease and No. 5 in the northeast 10 acres of the north 40. Both of these wells were dry and nonproductive.

After Rabon had received payment from the production from the lease for the drilling expense attendant upon the drilling of all five wells, Berry and the other plaintiffs, assignees of an interest in the overriding royalty reserved by Berry, received from the Midland Co-Operative Wholesale, which was purchasing and running the oil, the sum of $15,000, less gross production taxes. Midland Co-Operative Wholesale was thereupon notified by Rabon that that was all the money due plaintiffs under the Berry reservation in his assignment, and that all sums thereafter falling due from the purchase of oil by Midland should be paid to him, he in the meantime having acquired one-fourth of the Berry overriding royalty. When Midland impounded the money and refused to pay plaintiffs the additional sum plaintiffs brought this action.

In their brief the Rabons make two contentions, (a) that the trial court erred in construing the Berry-Rabon oil payment contract, and (b) that the trial court erred in allowing interest on plaintiffs' claim from August 15, 1948, the date that the oil was impounded, to the date of the judgment. Plaintiffs in their brief concede that the trial court erred in allowing interest on the claim, which they agree is an unliquidated demand, and consent that the judgment of the trial court may be modified to strike therefrom that portion of the judgment allowing them $1,253.16 interest. This leaves for consideration only the question of whether the trial court erred in construing the contract.

From the evidence produced by the parties and an agreed stipulation of facts it appears that' although Rabon drilled his first well upon the property with the intention of drilling a well upon each ten acres of the lease, should it prove productive, when the Osage-Layton sand was discovered to be productive in paying quantities the War was on, and the allocation of steel to the oil industry was under control of the Petroleum Administrator for War of the United States Government; that under his regulations governing the development of the Osage-Layton sand in this particular field, priorities for the purchase of material and equipment necessary to equip wells drilled to that sand could be obtained only if two wells were drilled upon each 40-acre tract covered by the oil and gas lease. In other words, that no priority would be granted unless the wells were drilled upon 20-acre spacing units. In order to obtain material and equipment to drill and equip his wells to the Osage-Layton sand, it was necessary that Rabon comply with these regulations, and he therefore drilled his wells on this lease to the Osage-Layton sand on 20-acre spacing units. He admits that this was done and that it was rendered necessary by the regulations of the Petroleum Administrator for War. But he contends that his original intention was to drill each 10-acre tract, and that such was the intention of the parties at the time the assignment was made, and that his wells were drilled on 10-acre tracts. He states that when the control of the War Administrator over the production ceased, he intended to complete the development of the south 40, which was the only produc-

tive territory discovered by his wells, by drilling additional wells thereon, but that before he commenced said wells an order was made by the Corporation Commission, by which 20-acre spacing units were established and that such order, of which he was unaware until after it was made, prevented his drilling the additional wells upon the two un-developed 10-acre tracts in the south 40 acres of his lease. From the record it appears that this order was pro-cured upon an application made for such spacing by Sunray Oil Company, which owned a lease adjoining Rabon's lease on the east, but that plaintiffs probably consented thereto.

Rabon admits that he drilled his No. 3 well upon the same 10-acre tract as that upon which his No. 1 well was drilled, in order to avoid paying plain-tiffs the additional $10,000, to which they would have been entitled if he had drilled such well upon the southeast ten acres of his lease, calling attention to the fact that the assignment provided that if more than one well was drilled upon a 10-acre tract, no additional sum should be received by plaintiffs by reason of the production of oil from said well. He urges that he was within his rights in so doing and we agree. We are unable to agree, however, with his contention that although the wells were drilled upon 20-acre units because of the regulations of the Petroleum Administrator for War, plaintiffs are entitled to only such sums as they would have received if the wells had been drilled upon 10-acre units. While it is true that the assignment stated that the overriding royalty payments were based upon 10-acre drilling units, it was expressly stated that if a larger drilling unit should be used, by order of the Corporation Commission or by election of Rabon, then the overriding royalty payment should be scaled up-ward at the rate of $1,000 per acre, but that the royalty payments to Berry should not exceed $1,000 per acre of the drilling unit used.

Defendants call attention to 15 O. S. 1951 §§154 and 155, providing that the language of a contract is to govern its interpretation if the language is clear and explicit and that when a contract is reduced to writing the intention of the parties is to be ascertained from the writing alone, and cite Terrill v. Laney, 200 Okla. 308, 193 P. 2d 296, and numerous other decisions of this court holding that where the language of a written contract is clear and explicit, and the contract itself plain and un-ambiguous, there is no need to apply technical rules of construction. They argue that in the instant case no pro-vision was made in the contract for increased payments because of the drilling of wells upon a larger spacing unit due to the action of the Petroleum Administrator for War; that the plain-tiffs would be entitled to have their overriding royalty payments scaled up-ward because of the using of a larger spacing unit only in the event that such larger spacing unit was required by the Corporation Commission, or was used by Rabon at his election, and that the order of the Corporation Commission, being issued after all the wells upon this lease had been completed, would not affect the rights of the parties.

We think the construction placed upon the contract by defendants is highly technical. 15 O. S. 1951 §152 provides as follows:

"A contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is as-certainable and lawful."

At the time the assignment and con-tract were made the only ways in which the size of the drilling units might be changed were those named in the contract, namely, orders of the Corpora-tion Commission, which had jurisdic-tion under the well-spacing provision of our statute, or the election of Rabon himself, it being within his power to use larger spacing units if he so de-

sired. But we think the contract when considered in its entirety clearly discloses the mutual intent and agreement of the parties that in the event larger spacing units should be used plaintiffs were to receive additional overriding royalty payments corresponding to $1,000 per acre for the acreage in each unit upon which a producing well was drilled.

In Baker & Strawn v. Butler Bros. & Lively, 141 Okla. 9, 283 P. 556, we said:

"This court will, if possible, in construing a contract, give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles. Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent."

While the control of the Petroleum Administrator for War and his right to regulate the size of the drilling units through his power to allocate or refuse to allocate materials and equipment was not contemplated by the parties at the time the contract was entered into, it nevertheless effected such change and resulted in the drilling of producing wells in the Osage-Layton sand upon 20-acre spacing units. Clearly, in such case, under the terms of the entire contract, plaintiffs would be entitled to receive the additional compensation.

That the wells drilled by Rabon were located on 10-acre tracts within the 20-acre spacing units does not alter the fact that they were drilled upon 20-acre spacing units. If it was the purpose and intent of Rabon to later drill the other 10-acre tracts, the drilling of such subsequent wells would not have entitled the plaintiffs to any additional sums under the provision of the contract. As it was, the drilling of such wells was prevented by the spacing order of the Corporation Commission, which divided the 40 acres into two rectangular 20-acre units, so that every well drilled in the south 40 to the Osage-Layton sand by Rabon was located upon a separate unit. This seems to have followed the general spacing arrangement in the area.

However, even if the contract be given a narrower and more technical construction, as contended for by Rabon, the use of the larger spacing units was due to the election of Rabon to proceed to develop and produce the Osage-Layton sand in accordance with the regulations of the Petroleum Administrator for War. Thus the drilling upon such larger spacing units was to that extent due to his election. So far as the record shows his election was made without consultation with plaintiffs, but they made no objection thereto, evidently assuming that they were protected by the terms of the contract. The trial court so held, and we think correctly. Rabon concedes that the regulations were temporary but says that his further drilling was prevented by the order of the Corporation Commission obtained by or with the connivance or consent of the plaintiffs. But this was clearly within their legal rights, just as his drilling of his No. 3 well upon the same 10 acres as his No. 1 was within his rights under the contract.

The judgment is modified by eliminating therefrom that portion allowing interest on the claim from August 15, 1948, to the date of judgment, in the amount of $1,253.16, and as modified is affirmed.

WELCH, CORN, GIBSON, DAVISON, JOHNSON, and O'NEAL, JJ., concur.